**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON**

Eastern District of Kentucky
**F I L E D**

MAR 0 5 2020

AT LEXINGTON
ROBERT R. CARR
CLERK U.S. DISTRICT COURT

**UNITED STATES OF AMERICA**

**V.**                                          INDICTMENT NO. 5:20-CR-42-KKC

**JOHN D. WATKINS and
KEVIN C. WATKINS**

\*   \*   \*   \*   \*

**THE GRAND JURY CHARGES:**

## INTRODUCTION

1.      **JOHN D. WATKINS** and **KEVIN C. WATKINS**, defendants herein, and others, worked together to defraud the United States through the filing of false insurance claims ultimately reimbursed by the United States Department of Agriculture ("USDA"), by making false statements and reports in connection with the federal crop insurance program.

2.      The Defendants also worked together and with others to file false insurance claims on Crop Hail policies, ultimately paid for by private insurance companies, by making false statements on the private policy documentation.

### STATUTORY AND REGULATORY BACKGROUND

3.      In 1938, Congress passed the Federal Crop Insurance Act ("Act"), 7 U.S.C.

§ 1501 *et seq.*, in order to promote the economic stability of agriculture in the United States through, in part, a system of crop insurance.

4.    In furtherance of this purpose, Congress established the Federal Crop Insurance Corporation ("FCIC"), which was authorized to insure crop losses due to drought, flood, or other natural disaster, as determined by the Secretary of the USDA. 7 U.S.C. §§ 1503 and 1508. Tobacco, wheat, corn, and soybeans were among the crops for which insurance was authorized under the Act. 7 U.S.C. § 1518.

5.    The Act only authorized the extension of insurance coverage to producers, that is, a person or entity with a bona fide insurable interest in a crop as either an owner-operator, landlord, tenant, or sharecropper. 7 U.S.C. § 1520. Farmers are producers. A crop insurance policy under the Act provided payments to a farmer when bad weather (freeze, drought, etc.) or other such naturally occurring events caused the harvest for the farm to be less than the amount specified in the insurance contract or written policy agreement, also known as the "guarantee." These federally-backed crop insurance policies are referred to as multi-peril crop insurance ("MPCI") policies.

6.    Farmers who opt to insure their crop are required to take out insurance policies prior to the growing season. Farmers generally do not pay their policy premiums until the growing season has ended and when the farmer knows whether or not his or her yield (i.e., the amount of crop harvested from a specific farm) justified an insurance claim. If the farmer makes a claim under his or her crop insurance policy, then the insurance premium is typically deducted from the amount paid out to the farmer under

2

the policy.

7.     Under the crop insurance program, eligible farmers are paid benefits based, in part, on factual representations as to the amount of crop harvested and sold and the cause of loss.

8.     The insurance coverage, also called the guarantee, and premiums of coverage are based on four or more years of production records for a particular crop grown by a farmer on a specific farm designated by its unique Farm Serial Number ("FSN"). This means that the farmer's actual production history ("APH") determines the insurance policy's guarantee, based on how much of that crop the farmer has produced on that FSN during each of the four years immediately preceding the year for which insurance is sought. 7 U.S.C. § 1508. If a farmer has produced that crop for more than four years, the guarantee will be based upon that farmer's production history of those preceding years, but no more than ten years of production history will be used. 7 U.S.C. § 1508. A new producer is a person who has not actively engaged in farming of the crop sought to be insured in the county for more than two years. 7 C.F.R. § 400.52. New producers are given an estimated production yield based upon the county average production for the crop for the past 4 years. See 7 C.F.R. §§ 400.52(m), 400.52(p) and 400.55(b)(6).

9.     A farmer can elect to insure tobacco crop up to 75% of the APH guarantee. If a farmer elects 75% coverage on his tobacco crop, that farmer needs to sustain crop damage in excess of 25% to trigger a claim payment. A farmer can elect to insure corn

and soybean crops up to 85% of the APH guarantee and may elect revenue protection.

10.     The Risk Management Agency ("RMA") is an agency of the USDA that supervises the FCIC and administers all programs authorized under the Act. 7 U.S.C. § 6933. Most crop insurance is sold by approved private insurance companies, called Approved Insurance Providers ("AIPs"), through an insurance agent working on behalf of the AIP. AIPs are reinsured by the FCIC/RMA under provisions established in a Standard Reinsurance Agreement ("SRA"), a contract between the AIPs and RMA. The FCIC/RMA also pays, or subsidizes, a portion of the premium paid by the farmer.

11.     The insurance agent obtains basic information from the producer pertaining to the crop to be insured. This information is reported on forms the producer sends to his or her agent. The producer and agent acknowledge on these forms that failure to report completely and accurately may void the applicant's crop insurance policy and may result in criminal or civil false claims actions. The crop insurance agent forwards this information through the insurance company to FCIC/RMA. This information, including the Production Worksheet, is used to calculate the premium to be paid by the producer for the insurance, and is also used to calculate the indemnity in the event of a loss claim.

12.     Producers often elect to take their crop to harvest even after the crop has sustained damage. A Production Worksheet is used to record the amount of harvested production to include crop sales, quality assessments, and harvest appraisals, among other things, to ascertain the production to count, or actual yield, used in determining the indemnity due. The producer certifies on this report that failure to report completely and

4

accurately may result in the voiding of the applicant's crop insurance contract and may result in criminal or civil false claims actions.

13.     The FCIC tobacco crop provisions provide for quality loss adjustment should the burley tobacco crop sustain damage reducing the quality of the crop. RMA's procedures for burley tobacco rely on grades assigned by Agriculture Marketing Service ("AMS") graders using USDA Official Standard Grades. The lowest grade quality is a No Grade ("NOG"). A loss that reduces the quality, or grade, of the tobacco can result in an increased indemnity.

14.     According to RMA established procedures, if the producer believes he or she has a potential loss of quality, he or she must determine which bales of tobacco need to be graded. The Tobacco Administration Grading Service ("TAGS") was established to facilitate the grading process and provide scheduling services via telephone or a website. A producer with a potential loss of quality can schedule an inspection with the AMS grader by contacting TAGS. The producer may ask his or her crop insurance agent for assistance in scheduling an inspection. The producer is charged a fee for the grading process. The producer receives a unique Grading Confirmation Number ("GCN") intended to track the bales graded. AMS electronically transmits the GCN information to RMA. Tobacco bales designated as NOG receive the highest discount factor resulting in a higher amount of loss, and thus, higher indemnities. The grade, weights, and other relevant information is transmitted to the appropriate insurance company to complete the claim.

15.    When a loss is paid on a crop insurance policy, the loss is calculated by the AIP and paid to the producer, often through the agent. Pursuant to the SRA, the AIP is reimbursed by the FCIC/RMA.

16.    Insured producers are required to retain documentation related to their crop from planting through the disposition of their crop, including receipts for seed and other expenditures.  They may be required to turn this documentation over to their agent or AIP to justify claims of loss or other inquiries.

17.    In addition to federal insurance coverage, a farmer may also elect to obtain private insurance coverage. The private market offers insurance coverage directly to the producer to cover specific perils, such as hail, wind, and fire.  State insurance departments regulate private crop insurance; FCIC does not reinsure or regulate private insurance.

18.    Private crop hail policies provide additional coverage and protection for the erratic damage hail can cause to a crop.  The advantages of a private crop hail policy are the availability to purchase from several private insurers for a variety of crops, claims are often paid following the damage assessment (i.e., even paid before harvest), and insurance may be purchased at any time during the growing season. Private crop hail insurance providers establish limits to the amount of dollar coverage for crops and premium rates.

19.    Private crop hail insurance is popular in areas prone to hail events during the growing season.  The producer may use private hail crop insurance as a tool to reduce the risk between the value of their crop and coverage available with the MPCI policy.  The difference between the actual production and the coverage level is often referred to as the

6

"gap" in coverage or a deductible. For example, if tobacco is insured at 75% (the maximum
allowed by the MPCI policy) of the production guarantee, the gap coverage is 25%. The
producer may use private hail crop insurance as a tool to reduce the risk between the value
of their crop and coverage available with the FCIC.

20.     AIPs often offer combination policies to their customers, whereby producers
can obtain a combination MPCI and private insurance coverage for their crop. In this
scenario, the federal government continues to reinsure the MPCI indemnities, while the
private company backs the private policy.

## FACTUAL BACKGROUND

21.     At all times relevant hereto, **JOHN D. WATKINS** owned and rented
farmland in Bath, Fleming, and Nicholas Counties, all located within the Eastern District
of Kentucky. **JOHN D. WATKINS** produced, among other crops, tobacco, corn, and
wheat. He insured his tobacco and corn crop in Nicholas County through federal crop
insurance policies issued by AgriLogic Insurance Services ("AgriLogic") and ARMtech
Insurance Services ("ARMtech") from at least 2010 until 2015. **JOHN D. WATKINS**
also insured his tobacco crop through private Crop Hail insurance policies issued by
AgriLogic in 2012 and ARMtech in 2014 and 2015.

22.     At all times relevant hereto, **KEVIN C. WATKINS** owned and rented
farmland in Bourbon and Nicholas Counties, both located within the Eastern District of
Kentucky. **KEVIN C. WATKINS** produced, among other crops, tobacco, corn, and
wheat. He insured his tobacco crop in Nicholas County through federal crop insurance

7

policies, issued by Producers Ag Insurance Group, AgriLogic, Great American Insurance Group, and ARMtech, from at least 2009 until 2015. **KEVIN C. WATKINS** also insured his tobacco crop through private Crop Hail insurance policies issued by AgriLogic in 2012 and ARMtech in 2014.

23.    At all times relevant hereto, **JOHN D. WATKINS** and **KEVIN C. WATKINS** owned and operated High Point Farms, LLC, a Kentucky Limited Liability Company organized on April 10, 2013. Beginning in 2013, **JOHN D. WATKINS** and **KEVIN C. WATKINS** grew corn and tobacco, among other crops, in Bourbon and Nicholas Counties, both within the Eastern District of Kentucky, under the name High Point Farms. **JOHN D. WATKINS** and **KEVIN C. WATKINS,** as High Point Farms, insured their corn and tobacco in 2013 and 2014 through federal crop insurance policies issued by ARMtech. Likewise, **JOHN D. WATKINS** and **KEVIN C. WATKINS,** as High Point Farms, also insured their tobacco crop through private Crop Hail insurance policies issued by ARMtech in 2013 and 2014.

## COUNTS 1 - 4
### 18 U.S.C. § 1014
### 18 U.S.C. § 2

24.    Paragraphs 1 through 23 above are re-alleged and incorporated herein by reference.

25.    On or about the dates listed below, in Nicholas County, located within the Eastern District of Kentucky, and elsewhere,

JOHN D. WATKINS

aided and abetted by others, and aiding and abetting others, knowingly made false

statements and reports for the purpose of influencing in any way the action of the FCIC,

and companies the FCIC reinsures, upon an application, advance, commitment, loan, and

insurance agreement or application for insurance or a guarantee, to wit:

| Count | Date | Description |
|---|---|---|
| 1 | February 8, 2012 | Production Worksheets indicating that **JOHN D. WATKINS** produced 12,176 pounds of tobacco in Crop Year 2011, when he then and there knew he had additional production of crop in that year he failed to report. |
| 2 | January 20, 2013 | Production Worksheet indicating **JOHN D. WATKINS** produced 11,980 pounds of tobacco in Crop Year 2012, when he then and there knew he had additional production of crop in that year he failed to report. |
| 3 | January 23, 2014 | Production Worksheet indicating **JOHN D. WATKINS** produced 3,294 pounds of tobacco in Crop Year 2013, when he then and there knew he had additional production of crop in that year he failed to report. |
| 4 | March 9, 2015 | Non-waiver indicating **JOHN D. WATKINS** produced 12,537 pounds of tobacco in Crop Year 2014, when he then and there knew he had additional production of crop in that year he failed to report. |

All in violation of Title 18, United States Code, Sections 1014 and 2.

## COUNT 5
### 18 U.S.C. § 371
### *Conspiracy to Defraud the United States*

26.     Paragraphs 1 through 23 above are re-alleged and incorporated herein by

reference.

9

## CONSPIRACY

27.     In or about August 2013, and continuing thereafter until on or about March 2015, in Nicholas County, located within the Eastern District of Kentucky, and elsewhere,

### JOHN D. WATKINS and
### KEVIN C. WATKINS

knowingly and willfully conspired and agreed together and with others known and unknown to the Grand Jury, to commit an offense against the United States, that is, making false statements and reports for the purpose of influencing in any way the actions of the FCIC, and companies the FCIC reinsures, upon an application, advance, commitment, loan, and insurance agreement or application for insurance or a guarantee, in violation of 18 U.S.C. § 1014.

### PURPOSE OF THE CONSPIRACY

28.     It was the purpose of the conspiracy to profit from the FCIC by making material misrepresentations on MPCI documentation supporting claims of losses on the policies in the name of **KEVIN C. WATKINS**.

### MANNER AND MEANS

29.     The manner and means used to accomplish the objectives of the conspiracy included, among others, the following:

a.  **KEVIN C. WATKINS**, in agreement with and with the assistance of **JOHN D. WATKINS**, submitted false claims of loss on **KEVIN C. WATKINS**'s MPCI policies for Crop Years 2012, 2013, and 2014, by

10

obtaining and submitting false reports of production in each of those years

to insurance companies issuing the MPCI policies, funded by the FCIC.

## OVERT ACTS

30.    In furtherance of the conspiracy and to effect the objects of the conspiracy,

the following overt acts, among others, were committed in the Eastern District of

Kentucky and elsewhere:

a.  On February 20, 2013, **KEVIN C. WATKINS** signed a Production

Worksheet indicating that he produced 6,520 pounds of tobacco in Crop

Year 2012, when he then and there knew he had additional production of

crop in that year he failed to report.

b.  On January 24, 2014 and March 11, 2014, **KEVIN C. WATKINS** or

**JOHN D. WATKINS** signed Production Worksheets indicating that

**KEVIN C. WATKINS** produced 7,915 pounds to count of tobacco in Crop

Year 2013, when they then and there knew **KEVIN C. WATKINS** had

additional production of crop in that year.

c.  On March 6, 2015, **KEVIN C. WATKINS** or **JOHN D. WATKINS**

signed a non-waiver form and submitted sales bills for a claim indicating

that **KEVIN C. WATKINS** produced 21,263 pounds of tobacco in Crop

Year 2014, when they then and there knew **KEVIN C. WATKINS** had

additional production of crop in that year he failed to report.

All in violation of Title 18, United States Code, Section 371.

11

## COUNT 6
### 18 U.S.C. § 1349
#### *Conspiracy to Commit Mail and Wire Fraud*

31.    Paragraphs 1 through 23 above are re-alleged and incorporated herein by reference.

32.    From on or about May 2013, and continuing through in or about December 2015, in Nicholas County, located within the Eastern District of Kentucky, and elsewhere,

### JOHN D. WATKINS,
### KEVIN C. WATKINS,

and others, knowingly and intentionally conspired with each other and with others to commit mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343.

### PURPOSE OF THE CONSPIRACY

33.    It was the purpose of the conspiracy to profit through the filing of false and fictitious Crop Hail insurance claims.

### MANNER AND MEANS

34.    It was part of the conspiracy that **JOHN D. WATKINS** and **KEVIN C. WATKINS** would obtain private crop hail insurance policies in the name of their company, High Point Farms, and submit false claims of loss on those policies in order to obtain financial gain.

a.    For example, in Crop Year 2013, **JOHN D. WATKINS** and **KEVIN C. WATKINS** obtained a private crop insurance policy in the name of High Point Farms, by causing their insurance agent, J. H., to submit their

12

application documents. J.H., **JOHN D. WATKINS** and **KEVIN C.
WATKINS** filed a claim of loss on the High Point Farms policy, with J.H.
and K.N. working on their behalf, and submitted nearly identical Test
Sheets auditing the loss to their crop as did two other producers on two
other farms.

35.    It was part of the conspiracy that **JOHN D. WATKINS** and **KEVIN C.
WATKINS** would obtain private Crop Hail insurance policies in their own individual
names, and submit false claims of loss on those policies in order to obtain financial gain.

    a.  For example, in Crop Year 2014, **JOHN D. WATKINS** and **KEVIN C.
WATKINS** obtained private crop insurance policies by causing their
insurance agent, M. M., to submit their application documents. **JOHN D.
WATKINS** and **KEVIN C. WATKINS,** with M.M. and adjuster T.W.
working on their behalf, filed a claim of loss on each of their policies that
contained a material misrepresentation, in that the claims of loss on the two
separate policies covering two separate farms contained matching
photographs of the damage to their crop. All relevant documentation was
submitted to ARMtech via mail or electronic wires.

36.    It was further part of the scheme that **JOHN D. WATKINS** and **KEVIN
C. WATKINS** caused the insurance company, ARMtech, to issue to **JOHN D.
WATKINS** and **KEVIN C. WATKINS** insurance indemnity payments based on the
claims of loss that contained material misrepresentations, which payments were either

13

sent in the form of a check through the mail or deposited electronically into a bank account using interstate wire communication.

All in violation of 18 U.S.C. § 1349.

## COUNT 7
### 18 U.S.C. § 1956(h)
### *Conspiracy to Commit Money Laundering*

37.    Paragraphs 1 through 36 above are re-alleged and incorporated herein by reference.

38.    From in or about December 2011 and continuing through in or about March 2015, in Nicholas County, located within the Eastern District of Kentucky, and elsewhere,

### JOHN D. WATKINS and
### KEVIN C. WATKINS

did knowingly combine, conspire, and agree with each other and with other persons, known and unknown to the Grand Jury, to commit offenses against the United States in violation of 18 U.S.C. §§ 1956 and 1957, to wit:

(a) knowingly conducting and attempting to conduct financial transactions

affecting interstate commerce, which transactions involved the proceeds of

specified unlawful activity, that is, 18 U.S.C. §§ 371, 1014, and 1349, knowing

that the transactions were designed in whole or in part to conceal and disguise

the nature, location, source, ownership, and control of the proceeds of specified

unlawful activity, and that while conducting and attempting to conduct such

financial transactions, knew that the property involved in the financial

14

transactions represented the proceeds of some form of unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); and

(b) knowingly engaging and attempting to engage in monetary transactions by, through, or to a financial institution, affecting interstate commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is, 18 U.S.C. §§ 371, 1014, and 1349, in violation of 18 U.S.C. § 1957.

**Manner and Means**

39.    The manner and means used to accomplish the objectives of the conspiracy included, among others, the following:

a.  In or about December 2011 until February 2013, **JOHN D. WATKINS** and **KEVIN C. WATKINS** received checks from Phillip Morris International and other tobacco companies that represented the sales of tobacco they failed to report to their insurance companies.  They would write checks for the same amount to Clay's Tobacco Warehouse.  E.L.P. then took those checks to Farm Credit Mid-America, and applied them to various accounts, including E.L.P. and his coconspirators.

b.  In or about November 2013, this scheme changed. **JOHN D. WATKINS** and **KEVIN C. WATKINS** received checks from Philip Morris International and other tobacco companies that represented the sales of their tobacco that they failed to report to their insurance companies.  They then

15

wrote checks to Clay's Tobacco Warehouse and AG Wood for the same amount as the money they received for their sales of tobacco.

c. R.W., or employees acting on R.W.'s behalf, deposited those checks into the Clay's Tobacco Warehouse or AG Wood bank accounts, and then wrote checks from Clay's Tobacco Warehouse or AG Wood accounts to Farm Credit Mid-America, less some money that he retained in the warehouse's bank account.

d. E.L.P. then took these checks to Farm Credit Mid-America, where he either deposited the funds in his own accounts and those of his co-conspirators, including **JOHN D. WATKINS**, or obtained new checks in the name of his co-conspirators, including **JOHN D. WATKINS** and **KEVIN C. WATKINS** for deposit on accounts housed elsewhere.

All in violation of Title 18, United States Code, Section 1956(h).

## FORFEITURE ALLEGATIONS
### 18 U.S.C. § 981(a)(1)(C)
### 18 U.S.C. § 982(a)(1)
### 28 U.S.C. § 2461

1.    The allegations contained in Counts 1-7 of this Indictment are hereby realleged and incorporated by reference for the purpose of proposing the forfeiture allegations pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(1) and 28 U.S.C. § 2461(c).

2.    Upon conviction of the offense in Count 7 of this Indictment, **JOHN D. WATKINS** and **KEVIN C. WATKINS** shall forfeit to the United States of America, pursuant to 18 U.S.C. § 982(a)(1), any property, real or personal, involved in such

16

offense, or any property traceable to such property, including but not limited to the below listed property.

3.     Upon conviction of the offenses in Counts 1 through 6 of this Indictment, **JOHN D. WATKINS** shall forfeit to the United States, pursuant to 18 U.S.C. §§ 981(a)(l)(C) and 982(a)(1) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the commission of such offenses, including but not limited to the below listed property.

4.     Upon conviction of the offenses in Counts 5 and 6 of this Indictment, **KEVIN C. WATKINS** shall forfeit to the United States, pursuant to 18 U.S.C. §§ 981(a)(l)(C) and 982(a)(1) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the commission of such offenses, including but not limited to the below listed property.

**MONEY JUDGMENT:**

A sum equal to the amount of gross proceeds in aggregate **JOHN D. WATKINS** and **KEVIN C. WATKINS** obtained as a result of the violations alleged in this Indictment.

6.     If any of the property described above, as a result of any act or omission of the Defendants:

       a.  cannot be located upon the exercise of due diligence;

       b.  has been transferred or sold to, or deposited with, a third party;

       c.  has been placed beyond the jurisdiction of the court;

d.  has been substantially diminished in value; or

e.  has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c).

By virtue of the commission of the felony offenses charged in this Indictment, any and all interest **JOHN D. WATKINS** and **KEVIN C. WATKINS** have in the above-described property is vested in the United States and hereby forfeited to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 18 U.S.C. § 982(a)(1) and 28 U.S.C. § 2461.

**A TRUE BILL**

_____
**FOREPERSON**

_____
**ROBERT M. DUNCAN, JR.**
**UNITED STATES ATTORNEY**

## PENALTIES

**COUNTS 1-4:**          Imprisonment for not more than 30 years, $1,000,000 fine, and supervised release for 5 years.

**COUNT 5:**          Imprisonment for not more than 5 years, fine of $250,000 or twice value of loss, and supervised release for 3 years.

**COUNT 6:**          Imprisonment for not more than 20 years, $250,000 fine, and supervised release for 3 years

**COUNT 7:**          Imprisonment for not more than 20 years, $500,000 fine or twice the value of the property involved in the transaction, and supervised release for 3 years

**PLUS:**          Mandatory special assessment of $100 per count.

**PLUS:**          Restitution.

**PLUS:**          Forfeiture as listed.